**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Brandi Lester, et al.,** | ) | **CASE NO. 1:15 CV 886** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Agment LLC, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |


### INTRODUCTION

This matter is before the Court upon Plaintiffs' Motion for Summary Judgment (Doc.

20). This case arises under the Fair Labor Standards Act ("FLSA") and the Ohio Minimum Fair

Wage Standards Act ("OMFWSA"). For the reasons that follow, plaintiffs' motion is

GRANTED.

### FACTS

Plaintiffs Brandi Lester and Samantha Stottlemire both formerly worked as exotic

dancers at an adult nightclub in Elyria, Ohio, called Agment Bar and Grill, d/b/a the "Brass

Pole." Defendant Harley Rowe is the owner of the Brass Pole. The club operates six days a week

1

from 5:00 p.m. to 2:30 a.m. and holds a license to serve food, drinks, and liquor to customers. (*See* Rowe Dep. at 15) ("Q: What type of food do [you] serve? A: Just ... soup, coffee, you know, just frozen burgers, buy them at Sam's Club, put them in the microwave and heat them up.").

The club employs a manager, DJ, bouncer, bartender, and door girl as employees. (*Id.* at 26). It also uses dancers to entertain its clients. Dancers audition before being hired, and according to defendant's former manager Melissa Anderson, performers must "display some base standard of skill, creativity, and sophistication" to be hired. (Anderson Dec. ¶ 3). Although some of the dancers whom the club hires "have a lot of experience, some do not." (Rowe Dep. at 27-28). Once hired, defendants classify the performers as independent contractors. Defendants do not compensate the performers. Dancers earned their income by performing dances for customers, who paid plaintiffs directly for their services. Performers are responsible for their own insurance, taxes, licenses, and any other operating costs associated with their performance, including a leasing fee to defendants of $5 per private dance. (Anderson Dec. ¶ 3).

Defendants suggest that customers pay a price of $20 per dance to the performers, but performers are permitted to negotiate with patrons to get as much as they can for their services. (*Id.* at ¶ 6). The club does not impose a minimum or maximum performance fee for any service. According to plaintiffs, the club sometimes ran "specials" where customers could pay $25 for two dances. (Lester Dec. ¶ 8). The club also has a VIP room, which customers can use for private dances. Customers pay a $50 rental fee per 15-minute rental directly to defendants for use of the VIP room. In the VIP room, dancers can negotiate with patrons for their performance fee and the nature of their services. Dancers do not pay a rental fee for the VIP room, and they maintain all of their negotiated performance fee from the customer.

2

Dancers are not required to schedule themselves to perform. But, if a dancer wishes to work in a particular week, she must schedule three six-hour timeslots during the week. If a dancer schedules herself for a weekend (the busiest nights at the club), she must also schedule herself for at least one weekday. (Anderson Dec. ¶ 4). Lester states that dancers were charged a fine if they arrived early or left late for a scheduled shift. (Lester Dec. ¶ 5). Defendants, however, state that they only assessed fines against performers who failed to appear for a scheduled performance. (Anderson Dec. ¶ 9).

The parties dispute whether dancers were permitted to perform at other establishments. The club's policy was that dancers should not work at other establishments, but Rowe testified that the policy was not enforced. (Rowe Dep. at 45); (*see* Anderson Dec. ¶ 4) (noting that dancers were permitted to perform at other establishments). Plaintiffs, however, state that defendants prohibited them from dancing at other clubs during the periods when they worked at the Brass Pole. (Lester Decl. ¶ 6; Stottlemire Dec. ¶ 5). Lester also testified that she heard a club manager state that dancers were not allowed to perform at other clubs and that she once witnessed Anderson fire a dancer for working at another club. (Lester Dec. ¶ 6).

Defendants advertise for The Brass Pole in local newspapers and on Facebook and also distribute business cards. (Rowe Dep. at 16-20). Dancers were also allowed to advertise their services through social media, business cards, and other promotional material. Defendants assert that performers "often independently contact their 'regular' patrons to inform them of their schedule in advance and convince them to show up at The Brass Pole when they are performing." (Anderson Dec. at ¶ 8).

Plaintiffs submitted a document entitled "Talent Conditions for Leasing the Premises" in

3

support of their motion for summary judgment. This document contains a list of standards

regarding a dancer's personal appearance, choreography, and behavior. Defendants state that any

standards they gave the dancers regarding their conduct and appearance are "suggestions aimed

at assisting performers in generating the highest performance fee possible." (Anderson Dec. at ¶

8). The Talent Conditions document, however, informs performers that defendants "prefer [that

dancers] carry [themselves] with class and sex appeal" and uses mandatory language for most of

the standards:

- Change your outfits, do not wear the same outfit all night.
- During the rotation you are required to dance and perform on stage.
- There is no chewing gum on stage.
- You are on stage for a minimum of two songs. Thirty-seconds into the second song, you should be down to your thong.
- You are required to attend and participate in every single special.
- While sitting with a customer, you want the customer to buy you a drink. After 15 minutes, if that same customer has not bought a dance or another drink, politely leave the table.
- You should never refuse a drink!
- You are required to wear your outfit at all times. This includes your shoes.
- When you leave the main floor to freshen-up or to change your outfit, you must first notify your DJ and/or the landlord on duty. After doing so, you have a total of ten minutes.
- When you sign in at the front door, you must immediately make your way to the dressing rooms and proceed to get ready. The time allotted to get ready is no more than 45 minutes.
- There are no boyfriends, husbands, or significant others in club while you are leasing space.
- No cell phones outside of the dressing room.
- Ask landlord before leaving the main floor.

(Pl.'s Mot. Summ. J., Ex. E).

The parties dispute how long plaintiffs worked at the Brass Pole. Lester claims that she

worked as an exotic dancer at the club from late October 2013 to mid-February 2014 and then

again from mid-May 2014 to February 12, 2015. Defendants state that she only worked at the

club from December 4, 2013 through mid-January 2014 and then from May 2014 through June

2014. Stottlemire asserts that she performed at the club in 2010 and between early August 2014

and late December 2014. Defendants, however, state that Stottlemire performed at the club in

August 2014 for no more than thirty days. Plaintiffs state that they worked approximately 42

hours per week throughout their employment but were never paid for their overtime hours.

Plaintiffs bring a claim for violations of the FLSA in count one of their complaint and for

violations of the OMFWSA in count two. In their motion for summary judgment, plaintiffs ask

this Court to find as a matter of law that they were employees of defendants for purposes of the

statutes. If the Court grants their motion, they ask for a jury trial on the issue of damages.

Defendants oppose plaintiffs' motion.

### SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1,

2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or
> the part of each claim or defense—on which summary judgment is sought. The
> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion

of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the

court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary

judgment if the motion and supporting materials—including the facts considered

undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

5

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

6

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**<u>ANALYSIS</u>**

The only issue in Plaintiffs' Motion for Summary Judgment is whether plaintiffs worked for The Brass Pole as employees or independent contractors. If they were employees, they would be entitled to the protections of the FLSA and OMFWSA[1], including payment for overtime wages. If they were independent contractors, they would not.

FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Under the statute, "employ" means "to suffer or permit to work." *Id.* § 203(g). The Sixth Circuit recently reiterated that FLSA is a remedial statute and that its definition of "employee" is "strikingly broad." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804, 806 (6th Cir. 2015) (noting that FLSA "'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles'")

---

[1]     The OMFWSA has adopted the same definition of "employee" as FLSA, so the analysis of whether plaintiffs were employees is identical under both statutes. *See* Ohio Rev. Code § 4111.14(B); *Ellington v. City of E. Cleveland*, 689 F.3d 549, 557 (6th Cir. 2012).

(quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

The Sixth Circuit has adopted an "economic realities" test to determine whether an individual is an employee or an independent contractor for FLSA purposes. Regardless of the label an employer gives an individual, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Id.* at 807. Courts are to use a six-factor test to assess the economic realities of a given employment situation:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; ... 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and] ... [6]] whether the service rendered is an integral part of the alleged employer's business.

*Id.* (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). The test is based on a totality of the circumstances, and no factor is dispositive. *Id.; see also Hart v. Rick's Cabaret Internat'l, Inc.*, 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013). Employee status is a mixed question of fact and law and can be determined on summary judgment where there are no genuine disputes of material fact.

Before addressing each of the factors, the Court notes that many courts have addressed whether exotic dancers are employees under the FLSA. The clear majority have found that the dancers are employees. *See, e.g., Reich v. Circle C. Invest., Inc.*, 998 F.2d 324, 329 (5th Cir.1993); *McFeeley v. Jackson Street Enter. LLC*, 47 F. Supp. 3d 260 (D. Md. 2014); *Verma v. Castor, Inc.*, No. 13-3034, 2014 WL 2957453 (E.D. Pa. June 30, 2014); *Hart*, 967 F. Supp. 2d at 912; *Thornton v. Crazy Horse, Inc.*, No. 3:06–CV–00251–TMB, 2012 WL 2175753 (D. Alaska June 14, 2012)**;** *Clincy v. Galardi S. Enters., Inc.*, 808 F.Supp.2d 1326, 1343 (N.D. Ga.2011)**;** *Thompson v. Linda and A. Inc.*, 779 F. Supp.2d 139, 151 (D.D.C. 2011)**;** *Morse v. Mer Corp.*,

8

2010 WL 2346334, at *6 (S.D. Ind.2010); *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla.1997); *Reich v. Priba Corp.*, 890 F. Supp. 586, 594 (N.D. Tex.1995); *Doe v. Cin-Lan, Inc.*, No. 08-CV-12719, 2008 WL 4960170 (E.D. Mich. 2008) (in addressing motion for preliminary injunction, finding that dancer was substantially likely to succeed on claim that she is an employee under FLSA); *but see Cruth's v. Vision's*, 2014 WL 282028 (E.D. Ark. Jan. 24, 2014) (finding genuine issue of material fact as to exotic dancers' status as employees).

The Court now addresses each factor of the economic realities test in turn "with an eye toward the ultimate question–[plaintiffs'] economic dependence on or independence from [defendants]." *Keller*, 781 F.3d at 807.

### 1. Permanency of the relationship

The parties dispute the length of time that plaintiffs worked at The Brass Pole and whether the relationship was exclusive. Taking the facts in a light most favorable to defendants, Lester worked at the club from December 4, 2013 through mid-January 2014 and then from May 2014 through June 2014, and Stottlemire performed at the club in August 2014 for no more than thirty days. Regarding the issue of whether plaintiffs were permitted to perform elsewhere, Rowe testified that The Brass Pole's policy was that dancers should not perform at other clubs but that the policy was not enforced. Lester, however, testified that she witnessed a dancer getting fired for working at another club, and defendants have not disputed this evidence.

Generally, a long, exclusive relationship weighs in favor of finding that the individual is an employee. *See Keller*, 781 F.3d at 807. Here, the short time period that plaintiffs worked for The Brass Pole weighs in favor of defendants. But the evidence showing that defendants expected their dancers to perform only at The Brass Pole weighs in favor of plaintiffs. *Id.* (noting

that even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship). Thus, as a whole, this factor does not support either party's position. Because exotic dancers tend to be itinerant, many courts that have addressed whether dancers were employees have accorded this factor only modest weight. *See, e.g., Hart*, 967 F. Supp. 2d at 921 (citing cases). In evaluating the totality of the circumstances, the Court will therefore accord this factor less weight than the other five factors.

### 2. The degree of skill required

Plaintiffs assert that they require no special skill or initiative to perform their dances and that defendants did not require them to possess a high degree of skill. On the other hand, defendants argue that performers had to use their skill and judgment in deciding such things as how they should dress or dance on any particular occasion, what their performance would look like, and what song they should dance to. Defendants also argue that plaintiffs were free to cultivate and solicit their own patrons and that they could negotiate with patrons to get as much money as they could for their services. Thus, according to defendants, "plaintiffs developed business initiative, acumen, and skills necessary to succeed in their independent business operation."

The Court finds that this factor weighs in favor of plaintiffs because the evidence does not show that plaintiffs' "profits increased because of the 'initiative, judgment[,] or foresight of the typical independent contractor." *Keller*, 781 F.3d at 809. Rowe testified that while some dancers have experience before working at The Brass Pole, some do not. Defendants also submitted no evidence showing that they required any special training of the dancers either before or after they were hired. Although defendants are likely correct that dancers' efforts to

10

cultivate and solicit customers increased the dancers' profits, courts have consistently rejected similar attempts by defendants to argue that such "hustling" amounts to skilled work. Indeed, as the *Hart* court noted, "every court to consider such a 'hustling' argument by a strip-club proprietor has rejected it." *Hart*, 967 F. Supp. 2d at 920 (citing cases). Similarly, courts have consistently held that exotic dancers "do not exhibit the skill or initiative indicative of persons in business for themselves." *Circle C. Invs.*, 998 F.2d at 328; *Thompson*, 779 F. Supp. 2d at 149-50; *Butler*, 2013 WL 5964476 at *5. Defendants have offered no evidence that distinguishes the exotic dancers at The Brass Pole from the exotic dancers that courts have held to be employees in analogous situations.

### 3. Plaintiffs' investment

In assessing the weight to give the third factor–whether the worker has made a significant capital investment–the Court "must compare the worker's investment in the equipment to perform his job with the company's total investment." *Keller*, 781 F.3d at 810. Though the record is silent on the total dollar figure that defendants spend on operating The Brass Pole each year, the undisputed evidence shows that, at a minimum, their expenditures include the costs of maintaining the premises on which the club is located, the salaries of several employees, advertising, licensing fees to serve food and beverages, and inventory of food and beverages. Defendants assert that plaintiffs invested in their jobs "by leasing performance space from Defendants, by committing however much of their time they chose to, by selecting and purchasing their costumes, by investing in their personal appearance...by controlling their weight and muscle tone, by designing their choreography, and by purchasing equipment, such as a cell phone or computer, to advertise their services." (Defs.' Mot. Summ. J. at 8). Defendants do not

11

cite any evidence in the record to support this statement, and they do not identify how much plaintiffs spent on any of these items. Moreover, the Sixth Circuit in *Keller* suggested that investment in an item that many people own, such as a cell phone or computer, is not necessarily evidence of economic independence. *Keller*, 781 F.3d at 810. That is particularly true in this case, where defendants have offered no evidence of how much money plaintiffs spend on advertising their services or whether they use their computers and cell phones primarily for their work.

Like nearly every court that has addressed this issue, the Court finds that this factor weighs in favor of plaintiffs because the evidence shows that defendants' investment in operating the Brass Pole is significantly greater than plaintiffs' investments in their positions as dancers at the club. Indeed, defendants admitted in their answer that "their capital expenditures outweighed expenditures by Plaintiffs." (Answer ¶ 28).

### 4. Opportunity for profit or loss

The next factor the Court must consider is "whether plaintiffs had an opportunity for greater profits based on their management and technical skills." *Keller*, 781 F.3d at 812. Defendants argue that genuine issues of material fact remain on this issue because plaintiffs could affect the amount of money they earned by making decisions regarding to whom they sold their services, the nature of the services they provided, and how they negotiated the price of their services. They also note that plaintiffs had control over other factors that could increase their earnings, such as the hours and days that they performed, their wardrobe, their choreography, and the advertising that they chose to do.

Viewing the evidence in a light most favorable to defendants, the evidence shows that

12

plaintiffs had some control over the amount of their income. Nevertheless, this factor weighs in favor of plaintiffs because the evidence is clear that defendants bore the greater opportunity for profits and losses. Defendants had a far more significant role than performers in drawing customers to The Brass Pole–the critical factor in determining the profits and losses of both defendants and plaintiffs. Specifically, defendants chose the location of the business, set the business hours, maintained the facilities and aesthetics, maintained the inventory of food and beverages, and advertised. *See Circle C. Investments, Inc.*, 998 F.2d at 328; *Hart*, 967 F. Supp. 2d at 920 ("Given Rick NY's control over most critical determinants of the number of customers who visited the Club on any given night or over time, the Club exercised a high degree of control over a dancer's opportunity for profit."); *Priba Corp.*, 890 F. Supp. at 593 (finding that entertainer's risk is limited to "tip out" fee while nightclub "shoulders the greatest risk"). As one court noted, "[a]s is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns." *Harrell*, 992 F. Supp. at 1352.

### 5. Degree of control exercised by defendants

The next factor is whether defendants exercised control over plaintiffs' work. Defendants argue that they do not exercise a significant degree of control over plaintiffs because plaintiffs determined their own schedule and could select what patrons they would perform for and at what fee. Plaintiffs were also free to advertise to develop their own business. Defendants assert that any standards of dress or personal appearance, performance choreography, or behavior were merely "suggestions" aimed at helping performers generate the highest possible performance fee.

13

According to defendants, the only fines they ever levied on plaintiffs were for failing to appear for a scheduled performance and were intended to compensate defendants for the damages they suffered from being short-staffed.

Plaintiffs dispute that the list of conduct in the Talent Conditions for Leasing the Premises were merely suggestions and cite the list as evidence that defendants exercised a significant degree of control over them. They also argue that defendants exercised control over performers by prohibiting them from performing as exotic dancers at other night clubs, requiring them to work at least six hours every shift, prohibiting them from working on a weekend shift without first working a weekday shift, requiring them to work at least three shifts per week, setting the price of the private dances at $20 unless they ran a "special" of two dances for $25, and charging dancers a monetary fine if they arrived early or left late.

Viewing the evidence in a light most favorable to defendants, some of the underlying facts on this issue are in dispute. In particular, the parties dispute whether plaintiffs were permitted to dance at other clubs, whether defendants set the price of private dances, and whether defendants levied fines on plaintiffs for arriving early or leaving late for a scheduled shift.

On balance, however, the Court finds that this factor weighs in favor of plaintiffs. While defendants assert that the behaviors identified in the Talent Conditions document were simply suggestions, the title of the document, "Talent *Conditions* of Leasing the Premises," contradicts this assertion. So, too, does the compulsory language of the conditions: "during the rotation you are *required* to dance and perform on stage"; "there *is no* chewing gum on stage"; "you are *required* to attend and participate in every single special"; "you are *required* to wear your outfit

14

at all times"; "when you sign in at the front door, you **must** immediately make your way to the dressing rooms and proceed to get ready[; t]he time allotted to get ready is no more than 45 minutes." These conditions show that defendants had a high degree of control over the manner in which plaintiffs performed their jobs. Moreover, defendants controlled many aspects of the scheduling and fined dancers if they failed to appear for a scheduled performance. And while the parties dispute whether defendants set a minimum price for dances, defendants have not contradicted plaintiffs' evidence that defendants set the price for dance "specials" from time to time. Thus, the record on this factor supports plaintiffs' position that they were employees of The Brass Pole rather than independent contractors.

### 6. The extent to which plaintiffs' services were integral to the business

Defendants contend that there are genuine issues of material fact as to whether plaintiffs' services were integral to their business because the record shows that "Plaintiffs' work activities amounted to an independent enterprise... [A]lthough they contributed to Defendants [*sic*] business by virtue of their dancing, they were not the only integral part of Defendants [*sic*] regular business." This argument is unpersuasive. Defendants have offered no evidence as to how exotic dancers were not an integral part of a bar doing business as "The Brass Pole" and where exotic dancers performed at the club every night that it was open. No reasonable juror could conclude that customers primarily came to the club for its other offerings, which included beer, liquor, and frozen burgers from Sam's Club.

### 7. Consideration of all factors

Even construing the disputed facts in favor of defendants, on consideration of all of the factors, the Court concludes that plaintiffs were employees of The Brass Pole for purposes of

FLSA and OMFWSA. Though the parties disagree as to some of the underlying facts, a reasonable jury could only conclude that the totality of the circumstances shows that plaintiffs were economically dependent on defendants. Dancers at the club had no specialized skills; they had a relatively small investment in their positions as compared to defendants' overall investment; defendants' opportunity for profits and risk of loss were much greater than plaintiffs'; defendants exercised significant control over how the dancers performed their jobs; and the dancers were integral to the success of The Brass Pole. Thus, while defendants labeled plaintiffs independent contractors, as a matter of economic reality, plaintiffs were employees of The Brass Pole. *Rutherford Food Corp v. McComb*, 331 U.S. 722, 729, 67 S. Ct. 1473 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act.").

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 20) is GRANTED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 4/20/16